In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

**NO. 09-21-00408-CV**
_____


**IN THE INTEREST OF O.V. JR., J.V., J.V., AND A.V.**

On Appeal from the County Court at Law No. 3
Montgomery County, Texas
Trial Cause No. 20-06-07075-CV

**MEMORANDUM OPINION**

Following a trial to the bench, Father—a Honduran national—appeals from

an order terminating his parental relationships with four of his five children—*Jack,*

*Ella*, *Daniel*, and *Luke*.[1] In three appellate issues, Father argues the evidence is

---

[1]To protect the identity of any minors the Department wanted to protect by terminating Mother's and Father's parental rights, we have used pseudonyms for their names. *See* Tex. R. App. P. 9.8(a), (b). Father has a fifth child, but his oldest daughter was an adult when the Department filed suit, the Department did not name Father's oldest child as a party to the suit, and Mother, the party the Department named as one of the parties in the suit, is not the oldest child's parent.

1

legally and factually insufficient to support the findings the trial court relied upon to terminate his parental rights.[2] Because Father's issues lack merit, we will affirm.

Background

In June 2020, the Department of Family and Protective Services (the Department) filed a petition seeking to terminate Mother's and Father's parent-child relationships with Jack, Ella, Daniel, and Luke. To support the petition, the Department filed an affidavit, signed by one of the Department's caseworkers. In the affidavit, the caseworker stated that on June 5, 2020, the Department received a report and learned that Father was in the custody of the Texas Department of Corrections, that Mother was homeless, and that the person taking care of Jack, Ella, Daniel, and Luke, in only a few days, would no longer be able to care for them over concerns the caregiver had for her health. Because no other family members could take care of the children, the caregiver told the Department she wanted the Department to remove the children from her home within a week. When the

---

[2]The trial court found that Father violated sections 161.001(b)(1)(D) and (E) of the Texas Family Code, which authorizes a trial court to terminate a parent's rights upon finding the parent placed the child in conditions or engaged in conduct that endangered the physical or emotional well-being of the child, as long as the trial court also finds that terminating the parent's rights is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D) (conduct endangerment); *id*. § 161.001(b)(1)(E) (condition endangerment); *id*. § 161.001(b)(2) (best interest).

Department investigated, it identified no relative who said they would take care of the children in place of their parents.[3]

On June 17, 2020, the trial court signed an order and named the Department as the children's temporary sole managing conservator. Pending a full adversarial hearing, the order authorized the Department to take possession of the children. The court scheduled the adversarial hearing on June 30, 2020. On June 30, the trial court appointed separate attorneys to represent Mother's and Father's interests in the proceedings.

Several weeks later, on August 7, the Department filed Family Service Plans in the trial court's record. The stated long-term goal in both plans was "Family Reunification."[4] Under the section of the plans that describes the Department's

---

[3]The caseworker's affidavit, which accompanies the petition, reflects the Department did not interview Father while he was in prison. According to the affidavit, the interview was not accomplished due to "restrictions at the prison." While the affidavit does not expressly state what the "restrictions" the affiant referred to, the testimony at trial shows the restrictions related to the Department's investigation were related to the Coronavirus (Covid-19) pandemic restrictions in facilities including jails, as the Department's investigation of this case occurred over the summer and fall of 2020. A letter Father sent to the District Clerk in June 2020, which was after Father was served with citation, acknowledges the restrictions on the facility where he was in prison related to the pandemic. His letter reflects he knew the Department attempted to interview him in prison but had not accomplished the interview because due to restrictions resulting from the pandemic, it "was not possible."

[4]Father's signature is not on the Family Service Plan, presumably because he was incarcerated, and the Department did not have the opportunity to hand the plan to him to sign. The plan reflects Father did not participate in making the group decisions reflected in the plan. While Mother's signature is also not on the plan, she

concerns about safety, the Department listed that Mother had a history of using pain pills and opiates, a concern about Father's incarceration, and a concern that as of July 2020, Father was deported to Honduras. The section of the plan that addresses decisions made by the family states: "Father was arrested for kicking in [M]other[']s door and attacking her." The Department's August status report reflects the Department's permanency goal remained "Family Reunification."

On December 20, 2020, the trial court conducted an initial permanency hearing. During the hearing, the trial court found the evidence failed to show that Mother and Father had complied with their family service plans. By February 2021, the records filed with the court show the Department's long-term goals for the children changed from family reunification to "Unrelated Adoption."

In November 2021, the trial court called the case to trial. In November 2021, Jack was fifteen, Ella was twelve, Daniel was ten (but nearly eleven), and Luke was nine-years old. Three witnesses testified in the trial: (1) Father, who appeared from a federal detention facility, which is where he was being held following his arrest after he was deported and made an unsuccessful attempt as an illegal alien to re-

---

is listed as a primary participant on the original plan. However, Mother is not listed as the primary participant on later plans. On the later plans, the oldest child replaces Mother as the "primary participant." Even so, Mother's attorney is listed among those who participated in preparing the later plans. We also note that Father's attorney is not among those listed as having participated in providing information use to create any of the plans.

enter the United States; (2) Leiza Siebert, the supervisor of the caseworker the Department placed in charge of the investigation the Department conducted to remove the children from the caretaker and to terminate Mother's and Father's parental rights; and (3) a court-appointed guardian ad litem, selected by CASA/Montgomery County and assigned to the case responsible for carrying out the duties assigned to CASA under the trial court's order dated June 17, 2020.

By Father's account, he is a good parent and protected his children from his wife, whom he explained in the trial has suffered with an addiction problem throughout much of their marriage. Father testified that he is a native of Honduras, explaining he first came to the United States, to California, in 1994. In 1996, Father moved to Texas, and he has lived in Texas since then. According to Father, he met Mother after moving to Texas. They married in August 2006, shortly before their first child was born.

Father blamed Mother for the incident that led to his arrest and conviction for burglary. He blames his conviction for making him unavailable to his children and requiring him to leave them with a caregiver while he was in prison. But Father's account about what occurred concerning his arrest and conviction for burglary conflicts with the information in the judgment relevant to his conviction, which was admitted into evidence in his trial.

Father's story about what happened in the burglary in the trial is that in August 2019, he came home from work and found Mother and her boyfriend inside his home. According to Father, his children were there. When Father arrived, Mother accused him of breaking into his own home. After he went inside, he found Mother's boyfriend with a knife, so he then had to defend himself from Mother and from her boyfriend. Father testified that after that, Mother called the police. Father explained that when the police came to the house, they arrested Father even though he told them the house was leased to him, not to Mother. Father testified the trial court in the criminal case convicted him even though he showed everyone the lease to prove he had a legal right to enter his own home.

But the judgment of conviction told a different story. And the Department offered the judgment into evidence, without objection, in the trial. It shows that Father was convicted of burglarizing a habitation. The judgment, from Harris County, reflects: (1) Father pleaded guilty to burglary; (2) Father was indicted for committing a first-degree-felony burglary, but plea bargained to a reduced penalty based on the penalty range that applies to convictions for second-degree felonies; and (3) the judgment includes an affirmative finding of family violence, as that term is defined by section 71.004 of the Texas Family Code.[5] In July 2002, Father

---

[5] *See id*. § 71.004 (defining *family violence* as "an act by a member of a family or household against another member of the family or household that is intended to

completed serving his sentence on the burglary, and he was deported based on his status as an alien who had been convicted of committing a felony while living in the United States.

Turning to the evidence about Father's relationship and knowledge of Mother's drug use, during the trial Father acknowledged that Mother's problems with drugs manifested after they married in many ways.[6] According to Father, they were evicted from their home nine or ten times after Mother failed to use the money he gave her for rent to instead buy drugs. Eventually, about seven months after their youngest child was born, Father left with the children, explaining he was tired of Mother stealing from him and stealing from the children, pawning their property so that she could buy drugs. Before he left her, Father took Mother to treatment for about two months to get her treated for drug abuse. But according to Father, the treatment Mother received was a failure.

Father also testified that he was aware that Mother was neglecting the children and taking drugs at home when he was away at work when they were living together

---

result in physical harm . . . but does not include defensive measures to protect oneself").

[6]The record is not clear about the exact drugs that Mother generally used. From the records in evidence, it appears Mother's problems relate to her use of pain pills, opiates, and methamphetamine. At trial, Father was never asked to explain whether he knew what drugs Mother preferred, when to his knowledge her problems with drugs began, or whether after leaving Mother he continued to allow Mother to visit and see the children without requiring those visits to be supervised.

and before he left her. During the trial, Father acknowledged he knew Mother was bringing people home and that Mother and the people she brought home with her while he was at work were taking drugs. According to Father, Mother was responsible for the children when they lived together, but she neglected her duties in several ways, for example she did not make the children attend school, and she did not know where the children were when he came home from work. Even so, Father never testified that he filed for a divorce, and he never testified that he asked a court to restrict or to terminate Mother's rights to Jack, Ella, Daniel, or Luke, so that he could limit the damages she might cause to them by exposing them to the adverse effects of her own decisions to bring others into their home and to abuse drugs.

So while Father tried to paint himself as the parent who protected his children from Mother's decisions to abuse drugs, the Department viewed Father's conduct in a different light. Leiza Siebert, the supervisor for Child Protective Services and the person responsible for handling Mother's and Father's case, testified that Mother's and Father's history with the Department revealed a "consistent pattern of drug use, alcohol use, domestic violence, and again, the unknown of whether they're going to be evicted or have food." According to Siebert, the Department's long-term goals for the children are for the children to be adopted by someone who is not related to them, but who is willing to adopt them together as a group. Siebert explained the Department has conducted a diligent search for relatives who might take the

8

children, but no relatives willing to take the children have been found. In the end, Siebert testified that, in her opinion, terminating Mother's and Father's parental rights is in the children's best interest.

Like Siebert, the CASA testified that she thought terminating Mother's and Father's parental rights is in the children's best interest. According to the CASA, she has spoken to the children many times since she was appointed to the case. The CASA explained she visits the children monthly. According to the CASA, she has called and left messages for Mother, but Mother never returns her calls. The CASA acknowledged she is aware that Father has written letters to the children, and she is aware that Father has possibly spoken to the children on the phone. That said, the CASA also testified the children don't talk about their Father with her.

The only remaining evidence the parties offered during the trial consists of several exhibits together with the contents of the district clerk's file. At the Department's request, the trial court took judicial notice of the district clerk's file.[7] The exhibits in evidence include the judgment of conviction and the family service plans, discussed above.

In the end, the trial court found that Mother and Father endangered Jack, Ella, Daniel, and Luke, and the trial court found that terminating Father's and Mother's

---

[7]Tex. R. Evid. 201 (Judicial Notice of Adjudicative Facts). There were no objections to the request, and the trial court granted the request in the trial.

parent-child relationships with the children is in their best interest.[8] On appeal, Father contends the evidence is legally and factually insufficient to the predicate findings and to support the best-interest finding.[9]

Analysis

On appeal, Father argues the Department failed to establish with clear and convincing evidence that he either engaged in conduct or that he created a condition sufficient to endanger his children. And he argues the Department failed to clearly and convincingly establish that terminating his rights to the children is in their best interest.

As defined by the Family Code, *clear and convincing evidence* "means the degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."[10] In cases parties try to the bench, the trial court acts as the factfinder and determines the credibility of the witnesses and the weight to be given to the testimony so the trial court is free to resolve any inconsistencies that may exist in the testimony in reaching a verdict.[11]

---

[8]*See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E).
[9]Mother did not appeal the trial court's findings terminating her rights. *See id.* § 161.001(b)(1)(D), (E), (N), (O), (b)(2).
[10]*Id.* § 101.007.
[11]*See Iliff v. Iliff*, 339 S.W.3d 74, 83 (Tex. 2011); *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005); *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986).

Father complains about the trial court's condition and conduct endangerment findings on insufficiency grounds. On appeal, we review the evidence to determine whether the trial court, acting reasonably, could have formed a firm belief or conviction based on the evidence that the parent violated subsection D or E and whether the evidence shows the condition or conduct evidence in the trial allowed the trial court, acting reasonably, to find the children were endangered.[12] In our review, we consider whether the inferences the trial court drew from the evidence are "reasonable and logical[.]"[13] Since the Department prevailed on both the subsection D and E claims, we assume the trial court "resolved the disputed facts in favor of its finding" on the findings Father challenges in his appeal.[14] To resolve Father's challenge to the predicate findings the trial court relied on under subsections D and E, we must resolve two questions: (1) Did Father knowingly place or allow the children to remain in conditions or surroundings that endangered them or (2) Did Father knowingly engage in conduct or knowingly place the children with a person who endangered them.[15]

---

[12]Tex. Fam. Code Ann. § 161.001(b)(1)(D),(E); *In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (on appeal, the reviewing court reviews the parent's complaints about conduct endangerment and condition endangerment findings based on the parent's right to due process).

[13]*In re E.N.C.*, 384 S.W.3d 796, 804 (Tex. 2012).

[14]*In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

[15]*See In re J.L.*, 163 S.W.3d 79, 85 (Tex. 2005).

11

In a factual-sufficiency review, we "give due deference" to the trial court's findings based on the direct and circumstantial evidence before the factfinder in the trial.[16] Under the factual-sufficiency standard, we must avoid supplanting the trial court's findings with findings of our own.[17] When examining the evidence, we look to the evidence as a whole and decide "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the [Department's] allegations."[18] To support an argument the evidence is factually insufficient to support the verdict, the parent should explain to the Court in his brief why the trial court could not have credited the disputed evidence in favor of its finding.[19] In the end, "[i]f, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient."[20]

---

[16]*In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (cleaned up).
[17]*Id.*
[18]*In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).
[19]*See In re J.F.C.*, 96 S.W.3d at 266.
[20]*Id.* at 267.

Analysis

*Predicate Findings—Subsections 161.001(b)(1)(D), (E)*

Because evidence in cases alleging that a parent violated both subsections D and E is related, we discuss Father's first two issues together.[21] Both subsections require the Department to prove the child was endangered.[22] That said, neither subsection requires the Department to prove that the parent engaged in conduct or that the parent created a condition that resulted in an actual injury to the parent's child. Instead, the focus at trial is whether the evidence shows the parent engaged in conduct or created a condition that created a danger to the child's physical or emotional well-being.[23] As defined by the Texas Supreme Court, the term *endanger* in section 161.001 means "expose to loss or injury; to jeopardize."[24] Generally, conduct by the parent that subjects a child to a life of uncertainty and instability is conduct that endangers a child's physical and emotional well-being.[25]

The type of evidence used to establish violations of subsections D and E often overlaps, as it does in the case before us here. Subsection D does not require multiple

---

[21]*See In re J.L.V.*, No. 09-19-00316-CV, 2020 Tex. App. LEXIS 2070, at *33 (Tex. App.—Beaumont Mar. 11, 2020, pet. denied) (mem. op.).

[22]Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E).

[23]*Id.*

[24]*In re J.F.-G.*, 627 S.W.3d 304, 313 (Tex. 2021) (quoting *Endanger*, WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY OF THE ENGLISH LANGUAGE 599 (1976)).

[25]*See In re J.O.A.*, 283 S.W.3d 336, 345 n.4 (Tex. 2009 (citing *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied)).

13

acts or omissions to terminate a parent-child relationship, as a single act or omission may suffice.[26] When the Department claims that a parent violated subsection D, we examine the period before the Department removed the child from the home in deciding whether the parent knowingly placed or allowed the child to remain in conditions that endangered the child's physical or emotional well-being.[27] In contrast to subsection D, an endangerment finding under subsection E may be "based on conduct both before and after removal."[28]

Often, trial courts rely on evidence showing that a parent engaged in a pattern of drug abuse as conduct that supports an endangerment finding as to that parent even when the evidence does not show the child manifested an actual physical or emotional injury from the parents abusing drugs.[29] A history that a parent abused drugs over a period of years, without getting treatment, is conduct relevant to proving

---

[26]*In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.) (citing *In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied)).

[27]*Id.* (citing *In re L.C.*, 145 S.W.3d 790, 795 (Tex. App.—Texarkana 2004, no pet.)).

[28]*In re A.L.H.*, 515 S.W.3d 60, 93 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (citing *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)).

[29]*Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

a circumstance that shows the parent is subjecting a child to a life of uncertainty and instability based on the parent's longstanding and untreated abuse of drugs.[30]

Here, the evidence does not show that Father was abusing drugs, but it does show that he knowingly allowed his children to remain in Mother's care for years while knowing Mother was abusing them. When Father testified, Father acknowledged that before he left Mother and took the children with him, he knew Mother was abusing drugs in the home while the children were in her care. The trial court heard Father testify that Mother allowed others who used drugs with Mother into the home while the children were there. While the conduct occurred many years before the Department sued to terminate Mother's and Father's parental rights, it remains conduct the trial court had the right to credit in favor of its subsection D and E findings in deciding whether to terminate Mother's and Father's relationships with Jack, Ella, Daniel, and Luke.[31]

While the evidence that shows Father routinely allowed Mother to be around the children while she was using was not recent, the evidence showing that Father kicked in a door and assaulted Mother while the children were present, conduct that

---

[30]*See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ).

[31]*See In re A.Q.H.*, No. 09-21-00075-CV, 2021 Tex. App. LEXIS 8000, at *13 (Tex. App.—Beaumont Sept. 30, 2021); *In re T.B.*, No. 09-20-00172-CV, 2020 Tex. App. LEXIS 8938, at *26 (Tex. App.—Beaumont Nov. 19, 2020, no pet.) (mem. op.) (citing *Vasquez*, 190 S.W.3d at 196).

resulted in his plea of guilty and resulting conviction for burglarizing a habitation, and that conviction was not remote. The judgment evidencing the conviction for burglary was admitted into evidence at trial, without objection, and includes a family-violence finding. The records from the Department, also in evidence, reflect that Father kicked in Mother's door and attacked her. At trial, Father testified he fought with Mother and her boyfriend, and the evidence allowed the trial court to infer that the children were present when Father broke into the home and the fight occurred. Although Father denied he had a knife during the altercation, which he described as an argument, he admitted "they" had a knife, and he testified the children were present and crying at the door.

From the evidence as a whole, we conclude the trial court could have formed a firm belief or conviction that terminating Father's parental rights was proper under subsections D and E.[32] As the sole factfinder, the trial court could reasonably find that Father broke into the home, a home that he did not own or lease, when Mother and the children were present. That Father then assaulted Mother while the children were present, conduct that when considered in light of conduct that shows for years Father had ignored the safety of his children by leaving them in the care of a Mother whom he knew was using drugs who was inviting random others to use drugs with her into their home is evidence we find sufficient to support the trial court's

---

[32]*See In re J.F.C.*, 96 S.W.3d at 264-65.

conclusion that Father violated subsection D and E, endangering the children's physical and emotional health.[33] We overrule Father's first two issues.

*Best-Interest Finding*

Under the Family Code, there is a strong presumption that keeping a child with a parent is in the child's best interest.[34] Even so, it is also presumed "the prompt and permanent placement of the child in a safe environment is…in the child's best interest."[35] When determining whether termination of the parent-child relationship is in the child's best interest, we consider the non-exclusive factors identified by the Texas Supreme Court in *Holley v. Adams*.[36]

---

[33]*See In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (subsections D and E both use the term *endanger*[,] which means "to expose a child to loss or injury or to jeopardize a child's emotional or physical health[]").

[34]Tex. Fam. Code Ann. § 153.131(b); *see also In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (noting that a "strong presumption" exists favoring keeping a child with its parent).

[35]Tex. Fam. Code Ann. § 263.307(a).

[36]In *Holley*, the Texas Supreme Court used these factors when reviewing the best-interest finding:
- the child's desires;
- the child's emotional and physical needs, now and in the future;
- the emotional and physical danger to the child, now and in the future;
- the parenting abilities of the parties seeking custody;
- the programs available to assist the party seeking custody;
- the plans for the child by the parties seeking custody;
- the stability of the home or the proposed placement;
- the parent's acts or omissions that reveal the existing parent-child relationship is improper; and
- any excuse for the parent's acts or omission

*Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

In a best-interest analysis, courts focus on the best interest of the child, not the best interest of the parent.[37] Often, the same evidence supporting the statutory ground for terminating a parent's rights under subsection D and E may support a trial court's best-interest finding.[38] And the Department need not present evidence proving each of the *Holley* factors, as the lack of evidence on some factors does not preclude the factfinder from forming a strong conviction that terminating the parent-child relationship is in a child's best interest, particularly when the evidence is undisputed that the parent endangered the child.[39] As the reviewing court, the question we must decide is whether the record as a whole supports the trial court's best-interest finding.[40]

Turning to the evidence of the *Holley* factors, we note that none of the children testified in the trial. And while Father testified he has been the parent responsible for raising the children for the past nine years, the CASA testified Father has not provided the children a stable home. Currently, according to the CASA, the children are thriving and making progress in foster care. The CASA also testified the children do not talk about living with their Father. When Father was asked if he thought the

---

[37]*Dupree*, 907 S.W.2d at 86.

[38]*In re T.R.S.*, No. 09-18-00482-CV, 2019 Tex. App. LEXIS 4913, at *15 (Tex. App.—Beaumont June 13, 2019, no pet.) ("The same evidence that supports a trial court's findings under subsections D, E, and O may also be relevant to the trial court's best-interest finding.").

[39]*In re C.H.*, 89 S.W.3d at 27.

[40]*Id.* at 28.

children should be sent to live with him in Honduras, he testified he did not believe that living there would in their best interest. Finally, Father's testimony reveals he has no concrete plans for the children to live with him given his current status as an illegal alien who has been deported from the United States and is currently being held in federal detention. Father did not describe how he planned to obtain a right to legally re-enter the United States, and the trial court could have reasonably inferred that if deported again, Father would continually attempt to re-enter the country illegally.

Unlike Father, the Department has a concrete plan for the children. The Department's supervisor, Ms. Siebert, testified the Department's long-term goal is for the children to be adopted as a family unit by a family or individual who is unrelated to them. According to Ms. Siebert, by terminating Mother's and Father's parental rights, the doors would be opened up "for [the children] to be adopted together and in a more family-type placement."

We concede (as we must) that Father's "parental rights are of constitutional magnitude."[41] Yet the rights of a parent are not absolute.[42] So a parent has no right to sacrifice the interests of a child merely to preserve a relationship with a child so that the parent may continue to engage in conduct that endangers the child's physical

---

[41]*Id.*
[42]*Id.*

safety or emotional well-being. While Father acknowledged he knew Mother had a serious problem with drugs and knew she had that problem for many years before he left her, he remains married to her and nothing shows that if he ever were able to legally re-enter the United States that he would restrict Mother from seeing the children, as she apparently exercised that right when Father entered the home where Mother lived, kicked in her door, and attacked her while the children were present in her home. So while Father claims Mother has had a serious drug problem that she cannot control, the record shows Mother still had access to the children as of August 2020, the date Father was charged with burglarizing the home where Father kicked in her door. Although Father claimed the home belonged to him, he never produced any documents or other evidence supporting that claim in the trial. And the fact he pleaded guilty to the burglary contradicts the testimony he offered in the trial.

Deferring to the trial court's role as the sole arbiter of the facts, as we must, we hold the trial court did not abuse its discretion by preferring a stable, safe, and permanent placement of the children over the outcome Father preferred.

## Conclusion

We conclude the evidence is legally and factually sufficient to support the trial court's predicate findings terminating Father's rights and the trial court's best-

interest finding.[43] Given the Court's resolution of Father's issues, the trial court's order terminating Father's parent-child relationship with Jack, Ella, Daniel, and Luke is

    AFFIRMED.


                                         _____

                                          HOLLIS HORTON
                                              Justice


Submitted March 7, 2022
Opinion Delivered March 31, 2022

Before Golemon, C.J., Kreger and Horton, JJ.

---

[43] *See* Tex. Fam. Code. Ann. §§ 161.001(b)(1)(D), (E), (b)(2), 262.307(a); *see also In re J.F.C.*, 96 S.W.3d at 266; *Holley*, 544 S.W.2d at 371-72.